IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA          §
                                  §
VS.                               §   CRIMINAL NO. 4:14-CR-146-Y
                                  §
JEFFREY WATTS                     §

ORDER TO SHOW CAUSE

On September 22, 2020, a hearing was held, at which time the
Court determined that the defendant, Jeffrey Watts, had violated his
conditions of supervised release. (ECF No. 81). The defendant was
adjudged guilty of such violations and sentenced to imprisonment for
a term of 4 months, pursuant to USSG § 7B1.4(a), p.s., upon release
from which defendant was sentenced to supervised release for a term
of 24 months under the same conditions set out in the Judgement in
a Criminal Case in case no. 4:14-CR-146-Y (1) in the United States
District Court for the Northern District of Texas on February 3, 2015,
plus any additional conditions imposed thereafter. (Judgment, ECF
No. 83).

During the revocation hearing on September 22, 2020, the
defendant represented to the Court that he had a job opportunity with
a childhood friend who defendant claimed to have known for 40 years,
and who owns real estate, restaurants, and a real estate management
and marketing company. (Ex. A, Rough Draft of Transcript, pp. 9-13).
Specifically, Defendant alleged that he was "certain" that he had
a job expanding his friend's restaurants in Amarillo and Fort Worth.
(*Id*. at 12). The defendant claimed that he discussed the job with

his friend "routinely at least a couple of times a month" prior to his most recent period of incarceration. (*Id.* at 13). During incarceration, the defendant alleged "I've spoken to my mom about it, and she has spoken with him." (*Id.* at 13). The defendant claimed he was originally supposed to begin work in October, but that due to COVID-19, his start date "very will might be pushed back." (*Id.* at 13). The defendant represented that this job was a "career opportunity," that might allow him to meet his financial responsibilities. (*Id.* at 13).

As a result of the defendant's alleged job opportunity, the Court reduced the sentence that it intended to impose at the outset of the hearing. The Court specifically stated on the record, "[t]he sentence I'm going to give you is almost entirely based on the representation that you have made about your job. . . . I'm going to tell you now . . . it's based on that job that I'm giving you the sentence I'm about to give you, rather than a more serious sentence." (*Id.* at 14). However, on September 23, 2020, the day after the revocation hearing, the Court received information from the United States Probation Office indicating that defendant's representations to the Court concerning his "career opportunity" were a complete fabrication. (Ex. B, Attachment to email from probation officer Joe Hunnicutt, dated September 23, 2020). Indeed, the defendant's alleged "childhood friend," David Smith, sent a letter to the probation office which stated that his last contact with the defendant was in October of 2018, and that he and the defendant "parted on poor terms." *Id.*

Unequivocally, Mr. Smith stated that "[t]here is no position waiting for [the defendant] here."  *Id.*

The Court suspects that the defendant misrepresented information to the Court, and that those misrepresentations were made knowingly and with the intent to deceive the Court.  The Court further suspects that defendant's misrepresentations constitute a fraud on the Court which resulted in clear error as to the sentence the Court imposed. In view thereof, the Court is considering whether it should vacate its September 23, 2020 judgment (ECF No. 83) under Federal Rule of Criminal Procedure 35(a) and the Court's inherent power to correct a judgment procured through fraud.  *See Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944), *overruled on other grounds*, *Standard Oil Co. of California v. United States*, 429 U.S. 17 (1976); *United States v. Bishop*, 774 F.2d 771, 774 n.5 (7th Cir. 1985) ("The fact that this case involves a fraud perpetrated upon the court during the criminal sentencing process rather than during a civil proceeding, such as in *Hazel-Atlas*, does not change the result.  It is the power of the court to correct the judgment gained through fraud [that] is determinative and not the nature of the proceeding in which the fraud was committed."); *see also United States v. Smiley*, 553 F.3d 1137, 1145 (8th Cir. 2009); *but see United States v. Washington*, 549 F.3d 905 (3rd Cir. 2008).

The Court will conduct a hearing on Wednesday, September 30, 2020, at 10:00 a.m. in the fifth-floor courtroom of the Eldon B. Mahon United States Courthouse, located at 501 W. 10th Street, Fort Worth,

Texas.  The Defendant is ordered to appear and show cause as to why the Court should not vacate the sentence of imprisonment for a term of 4 months followed by supervised release for a term of 24 months and reconvene the revocation hearing with a view to impose a different sentence.

SIGNED September 25, 2020.


_____
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

EXHIBIT A

```
 1    [******ROUGH DRAFT PURPOSES ONLY - NOT PROOFED OR FINAL****]

 2               IN THE UNITED STATES DISTRICT COURT

 3              FOR THE NORTHERN DISTRICT OF TEXAS

 4                     FORT WORTH DIVISION

 5   UNITED STATES OF AMERICA,    ) CASE NO. 4:14-CR-146-Y
                                  )
 6          Government,           )
                                  ) FORT WORTH, TEXAS
 7   VERSUS                       )
                                  ) SEPTEMBER 22, 2020
 8   JEFFREY WATTS,               )
                                  )
 9          Defendant.            ) 1:57 P.M.

10

11                     VOLUME 1 OF 1
                    TRANSCRIPT OF REVOCATION
12            BEFORE THE HONORABLE TERRY R. MEANS
              UNITED STATES DISTRICT COURT JUDGE
13

14   A P P E A R A N C E S:

15   FOR THE GOVERNMENT:      MR. DOUGLAS ALLEN
                              UNITED STATES DEPARTMENT OF JUSTICE
16                            NORTHERN DISTRICT OF TEXAS
                              801 Cherry Street, Suite 1700
17                            Fort Worth, Texas  76102-6882
                              Telephone:  817.252.5200
18
     FOR THE DEFENDANT:       MR. MICHAEL LEHMANN
19                            ASSISTANT FEDERAL PUBLIC DEFENDER
                              NORTHERN DISTRICT OF TEXAS
20                            819 Taylor Street, Room 9A10
                              Fort Worth, Texas  76102
21                            Telephone:  817.978.2753

22   COURT REPORTER:          MS. DEBRA G. SAENZ, CSR, RMR, CRR
                              501 W. 10th Street, Room 424
23                            Fort Worth, Texas  76102
                              Telephone:  817.850.6661
24                            E-Mail: debbie.saenz@yahoo.com

25   Proceedings reported by mechanical stenography, transcript
```

1    produced by computer.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              September 22, 2020 - 1:57 p.m.

3         (Masks utilized)

4         COURT SECURITY OFFICER:  All rise.

5         (Judge enters)

6         THE COURT:  Let's be seated.

7              Next before the Court is the Supplemental Petition

8    and Petition for Offender Under Supervision in Case Number

9    4:14-CR-146-Y, United States of America versus Jeffrey Watts.

10             Are the parties ready to proceed?

11        MR. ALLEN:  Douglas Allen for the government, Your

12   Honor, and the government's ready.

13        MR. LEHMANN:  Michael Lehmann for Mr. Watts, and

14   we're ready, Your Honor.

15        THE COURT:  Mr. Watts, please acknowledge your

16   presence in court for the record by stating your full name.

17        THE DEFENDANT:  Jeffrey D. Watts.

18        THE COURT:  Thank you, sir.

19             Mr. Watts, it is alleged in a Petition and

20   Supplemental Petition for Offender Under Supervision that you

21   have violated certain conditions of your supervised release.

22             In particular, it is alleged that by consuming

23   alcohol in January and February of 2020, you violated standard

24   condition number 2 and the special condition requiring you to

25   abstain from the use of alcohol.

```
1              Also, that by failing to make payments on the unpaid

2     balance of your restitution at the rate of $500 per month, you

3     violated standard condition -- pardon me, you violated the

4     additional condition requiring you to make that restitution.

5     That's from the original petition.

6              In the supplemental petition, it's alleged that by

7     traveling outside the Northern District of Texas without

8     permission of the Court in or about April of 2020, you

9     violated standard condition number 1, and that by failing to

10    submit a monthly report form in the months of May and June of

11    2020 as directed by the probation officer, you violated

12    standard condition number 2.

13             How do you plead to each of these allegations

14    against you, sir, true or not true?

15             THE DEFENDANT:  [True.

16             THE COURT:  Does the government have anything to

17    present to the Court in support of the defendant's plea of

18    true?

19             MR. ALLEN:  No, Your Honor.

20             THE COURT:  Does the defendant have anything to

21    present to the Court, either on the question of revocation or

22    the appropriate sentence in the event of revocation?

23             MR. LEHMANN:  Just argument, Your Honor.

24             THE COURT:  Go ahead.

25             MR. LEHMANN:  Your Honor, we would ask the Court for
```

1    a guideline sentence of 4 months, time served.

2            After discharge from prison in April of 2018,

3    Mr. Watts spent two-and-a-half years in compliance on

4    supervised release.  Mr. Watts was sentenced to

5    five-and-a-half years in prison on this underlying case.  He

6    discharged to a halfway house and ultimately to his family in

7    West Texas.  He had to return home to a small town as a man

8    disgraced, who had largely betrayed the trust of his closest

9    friends and family members.

10            On top of the $5 million restitution ordered,

11    Mr. Watts was in arrearages for failure to pay child support

12    to his three children for the five-and-a-half years that he

13    was in the Bureau of Prisons.  Indeed, he had fallen from a

14    pinnacle of wealth into a debt obligation that he is likely

15    never to fully repay.

16            In spite of these insurmountable odds, Mr. Watts got

17    to work.  For a time, Mr. Watts helped an old family friend

18    manage restaurants in and about the Lubbock area.  Then he

19    looked to leave the small town and the pressure of small-town

20    scrutiny and moved out west.

21            For a time, he was employed by a Costco distributor

22    in Salt Lake City, and then later he was employed in the Lake

23    Tahoe/Reno area working for Legal Match, which is a marketing

24    business for attorneys.  On the side, he picked up a couple of

25    jobs, first as a research writer for UC Davis and then editing

1   papers for college students, all to supplement his income.

2         Mr. Watts picked up two DWIs within a month's time

3   at the beginning of this year.  When I ask him about his

4   triggers, he talks to me about the financial stress that he

5   feels and also the stress about returning back to small-town

6   Amarillo where he has to face the people that he betrayed.

7         Mr. Watts was arrested on this supervised release

8   revocation warrant four months ago, in the early days of the

9   pandemic, and has been traveling through the Northern District

10  of Texas, jail to jail, over all of this time.  He got COVID

11  while he was in Utah and was quarantined for a while.  The

12  short end of this, Your Honor, is that it's been a long

13  journey over the last four months just to get back here to

14  have this hearing.

15        With regard to the allegations in the supplemental

16  petition, we note that the violation of standard condition 2,

17  that he submit a monthly report, occurred while he was in

18  transit in custody to the Northern District of Texas.  So we

19  agree that it's true, but we would simply offer the mitigating

20  fact that he was unable to report because he was in custody.

21        *THE COURT:*  All right.  Thank you.

22        *MR. LEHMANN:*  Your Honor, we would just ask for a

23  sentence of 4 months.  We believe that this would adequately

24  address the violations.  Thank you.

25        *THE COURT:*  Mr. Watts, do you wish to speak on your

1    own behalf or present any information in mitigation of your

2    sentence?

3            *THE DEFENDANT:*  If I could, please.

4            *THE COURT:*  Go ahead, sir.

5            *THE DEFENDANT:*  Thank you.  Thank you, Michael.

6            Hello.  I'm nervous, but here I stand, yet again,

7    and I think if I had to tag one word, it would be embarrassed.

8    As I read through this document, all I could think about was

9    my children getting online and reading that about their

10   father.

11           *THE COURT:*  How old are they?

12           *THE DEFENDANT:*  Right now, my oldest is 18 and just

13   started at College Station, and my son who is in the middle,

14   he is 16, and then a 14-year-old daughter.

15           *THE COURT:*  He's what, sir?

16           *THE DEFENDANT:*  He's 16.  He's a junior here in Fort

17   Worth, and then a 14-year-old, so she's in eighth grade.

18           And wonderful kids --

19           *THE COURT:*  So you have three?

20           *THE DEFENDANT:*  Yes, sir.  And wonderful children,

21   wonderful ex-wife, and I certainly put her in a difficult

22   situation.  I think her idea of domestic tranquility existed,

23   and that was her dream, and so it wasn't that I just left and

24   betrayed and abandoned and stole a dream, I stole her lifetime

25   dream.  She's done an amazing job of recovering and filling in

```
1    large shoes as a single parent.
2            So, for me, when I hear Michael talk about drinking,
3    I went 40 years without drinking being a substantial problem,
4    maybe 38, so I think it was easy for me to --
5            THE COURT:  How old are you now, sir?
6            THE DEFENDANT:  I'm sorry?
7            THE COURT:  How old are you now?
8            THE DEFENDANT:  I'm 47.  And I think for lack of a
9    better word, I was, you know, lying to myself.  When I got
10   out -- when I got out, it was much more difficult than I ever
11   imagined.  In some sorts -- in some respects, certainly harder
12   than prison, facing the ones not only that I betrayed, just my
13   family, my friends, just ones that entrusted me but loved me
14   and forgave me, but it still didn't make it easy.
15           And I think whether it's called a trigger or a
16   weakness or whatever it is, I found it very easy to turn to
17   alcohol.  However, after getting two DWIs, it's -- it's
18   impossible for one to continue with the lie that I have
19   control of it.
20           THE COURT:  Now, have you been convicted of those?
21           THE DEFENDANT:  I have not, no, no.
22           THE COURT:  Okay.  But they are pending?
23           THE DEFENDANT:  They are pending.  And although the
24   first perhaps might -- although the first might -- I might
25   have some luck with the first.  I understand that, in both, I
```

1   had been drinking, so I don't want to suggest otherwise.

2          So, for me, as I stand there, I mean the

3   consequences are those -- I understand I'll have to face

4   those, but for me, as a long term, it's sobriety, and it's

5   100 percent and that's easier to do than the 99 percent.  As

6   of today, I'm actually sober for seven months.  Four months

7   incarcerated makes it a lot easier, but three months where it

8   wasn't easy time, and that's typically the times that I'm

9   turning towards that.

10         Moving forward and away from that, I am excited

11  about a few things.  I'm optimistic.  I do have a great job

12  opportunity that, along with the current jobs that are really,

13  for lack of a better word, just tangential or they are not --

14  they are side jobs.

15         *THE COURT:*  Tell me about your great opportunity.

16         *THE DEFENDANT:*  Opportunity is a childhood friend

17  that believes in me still, and I've known him probably for 40

18  years, and he has -- he has real estate, and he has

19  restaurants, and he has a real estate management company, a

20  marketing company.  He's been very successful.

21         *THE COURT:*  Here in Fort Worth?

22         *THE DEFENDANT:*  He's in Amarillo, Texas.

23         *THE COURT:*  Amarillo.  So you've already been

24  working for him before?

25         *THE DEFENDANT:*  I have worked for him before, and it

1  was really too close to finance.  It was more --

2          *THE COURT:*  Too close to what?

3          *THE DEFENDANT:*  To finance, which was obviously

4  prevented from the judgment, and then that was also temporary.

5  This would be more full-time going on through a massive

6  expansion.  So, to be able to take part in that, for me, it's

7  not only rekindling with a friend, it's a friend that still

8  believes in me.

9          *THE COURT:*  How did you know him?

10          *THE DEFENDANT:*  Playing sports growing up.

11          *THE COURT:*  In Fort Worth?

12          *THE DEFENDANT:*  Went to elementary in Amarillo, went

13  to elementary, and went to junior school, went to high school

14  with him.  One of my closest friends, and I have great, great

15  memories.

16          *THE COURT:*  And Amarillo is basically your hometown?

17          *THE DEFENDANT:*  Amarillo is where I grew up.  It

18  is -- for me, it's a difficult place to live.  If I had my

19  drathers, I would choose elsewhere, and I think this -- this

20  opportunity will evolve into Fort Worth as the expansion is

21  really starting with the western part of Fort Worth and moving

22  east from Amarillo and Lubbock.

23          *THE COURT:*  Okay.  Now, why is Amarillo difficult

24  for you?

25          *THE DEFENDANT:*  It's -- to answer that, it's

1    probably more on myself.  I probably -- before release, I

2    think I -- I would answer that question, well, I grew up in a

3    family where expectations were very defined, where financial

4    success was very demanding, expected, where it was -- I grew

5    up in a very middle-class family.  They are wonderful,

6    wonderful people.  My parents, I can't say enough about them.

7    I have a tremendous sister.  She is a quadriplegic and teaches

8    high school in a private school out on the east coast.  She's

9    an amazing person.  She is a hero to me, very influential.

10            But -- so, it's facing people that had expectations,

11   but that doesn't -- it really didn't come from them, and it's

12   been an evolution for me to get to this thought process.  It

13   came from me.  I put that upon myself, not to let them down.

14            I mean, it was kind of arrogant for me to think they

15   go about their daily lives thinking about me.  That -- I would

16   say that, misplaced or not, has been the hardest part and the

17   part that I dreaded most about being released in Amarillo.

18   It's subdued more than it was upon release, and I do look

19   forward -- I'm excited about the opportunity, I really am.

20   I'm excited about -- because I didn't -- I didn't have this

21   six, seven months ago, and so --

22            *THE COURT:*  How did it come about that he reached

23   out to you?

24            *THE DEFENDANT:*  They got some -- they got a capital

25   investment.  They had been looking for expanding their

```
 1    restaurant business for probably about two years now, and so
 2    it's been a -- I think it was a much shorter plan than that,
 3    but I think COVID got in the way.  So in that respect, it
 4    probably helped me out, but they have got a capital
 5    investment.
 6            Right now they have three restaurants, closed a
 7    fourth down, but plan to open here in the metroplex.  They're
 8    really starting, not only in Fort Worth, but on the west side
 9    of Fort Worth, western part of Fort Worth into Aledo and
10    Weatherford.
11            THE COURT:  What's the concept?
12            THE DEFENDANT:  The concept is really fast food
13    Asian.  Chop Chop Rice is the name of it, and it's fast food
14    Asian.  And then, if I had to make some sort of comparison, I
15    think they serve a little fresher food.  If I had to -- I
16    would say it's more of the baha fresh of the Asian or Chinese
17    food, so it's a fresher food to the Asian market.
18            THE COURT:  Okay.  And you're certain you have that
19    job now?
20            THE DEFENDANT:  Yes.  Yes.  I'm very excited about
21    it.
22            THE COURT:  How did he -- how did you make contact
23    with him?  Did you reach out to him or did he reach out to
24    you?
25            THE DEFENDANT:  We touch base.  We touch base
```

1    probably routinely at least a couple of times a month.

2    Haven't since, I guess, over the last four months.  He is

3    aware of it.  I've spoken to my mom about it, and she has

4    spoken with him.  Original time for start obviously was going

5    to be in the summertime.  It's been pushed now back to

6    October, and, of course, with COVID it very well might be

7    pushed back.

8            It doesn't mean there's not a present for me.  My

9    job is not only identifying -- it's not going in there and

10   working inside the restaurants, but it's more market research

11   and identifying places.  My background is really, really

12   economics, so it's identifying places where to put those.  I

13   don't have really a background in that, but it's -- I think

14   it's -- I guess the difference I see in this one, as opposed

15   to the others, is I see this as a career opportunity, a career

16   opportunity that might afford me the opportunity to live in

17   Fort Worth as well as meet my financial responsibilities.

18           THE COURT:  Now, when you graduated from TCU, what

19   was your degree?

20           THE DEFENDANT:  Economics.

21           THE COURT:  So you have a BBA?

22           THE DEFENDANT:  I'm sorry?

23           THE COURT:  You have a Bachelor of Arts or --

24           THE DEFENDANT:  It's a BS, yes.

25           THE COURT:  When did you first go back into custody?

1          *THE DEFENDANT:*  May 22nd, four months ago today.

2          *THE COURT:*  Does the government wish to be heard?

3          *MR. ALLEN:*  No, Your Honor.

4          *THE COURT:*  [Okay.  The sentence I'm going to give

5    you is almost entirely based on the representation that you

6    have made about your job.  If it turns out you don't actually

7    have that job --

8          Don't we have a requirement of full-time work in the

9    standard or any conditions?  I didn't check it.

10         *PROBATION:*  Yes, Your Honor.  Employment -- I don't

11   think it's specified that it has to be full-time, but there is

12   a condition, a standard condition that calls for suitable

13   employment, unless it's excused by the probation officer, the

14   Court, or a good enough reason.

15         *THE COURT:*  Okay.  I'm going to give you this

16   sentence, but I'm going to tell you now, I'll ask the

17   probation officer to file another petition if you don't have

18   that job because it's based on that job that I'm giving you

19   the sentence I'm about to give you, rather than a more serious

20   sentence.

21         Fair enough?

22         *THE DEFENDANT:*  That sounds great.

23         *THE COURT:*  Okay.  The other reason is you don't

24   have any prior criminal history.

25         *THE DEFENDANT:*  No, sir.

1          *THE COURT:*  The only criminal history you've got now
2     is the crime that you were charged with in 2014 --
3          *THE DEFENDANT:*  Yes.
4          *THE COURT:*  -- and the two DWIs, right?
5          *THE DEFENDANT:*  Yes.
6          *THE COURT:*  Okay.  Okay.  I'll announce my decision.
7     The attorneys will have a chance to make objections before the
8     decision is final.
9          [I adopt the statements contained in the term of
10    supervised release petition.  I've additionally considered the
11    evidence, the arguments presented in the petition, and what
12    I've heard here.
13         I find that Jeffrey Watts has violated the following
14    conditions:
15         Standard condition number 7, the special condition
16    regarding abstaining from the use of alcohol, and the
17    additional condition regarding paying restitution.
18         The United States Sentencing Commission policy
19    statements contained in Chapter 7 of the guidelines manual
20    regarding supervised release violations have been duly
21    considered.
22         It is the judgment of the Court that Jeffrey Watts
23    in Case Number 4:14-CR-146-Y be committed to the custody of
24    the Federal Bureau of Prisons for a term of 4 months pursuant
25    to Sentencing Guideline Section 7B1.4(a).

1            Upon release from the custody of the Federal Bureau

2    of Prisons, Mr. Watts shall return to federal supervised

3    release for a term of 24 months under the same conditions as

4    set out in the judgment in a criminal case in Case Number

5    4:14-CR-146-Y in the United States District Court for the

6    Northern District of Texas on February 3, 2015, plus any

7    additional conditions imposed thereafter.

8            While under supervision, Mr. Watts committed new law

9    violations, including driving while intoxicated, making him a

10   risk to the community.  A sentence of 9 months -- pardon me, 4

11   months, will serve as deterrence from further criminal

12   activity and protection of the community and address the

13   violation conduct.

14           I've now stated the sentence and the reasons

15   therefor.  I call upon the parties to indicate any legal

16   reason why sentence may not be imposed as stated.

17           MR. ALLEN:  None from the government, Your Honor.

18           MR. LEHMANN:  None from the defense, Your Honor.

19           THE COURT:  Sentence is then imposed as stated.

20           Mr. Watts, you have the right to appeal the sentence

21   that I have imposed.  You also have the right to apply for

22   leave to appeal in forma pauperis, if you are unable to pay

23   the costs of an appeal.

24           You've returned to me this morning -- this

25   afternoon, an instrument entitled, Notice of Right to Appeal

1    Sentence.  Please understand that this is the Court's notice
2    to you that you have the right to appeal.  It is not your
3    notice to the Court that you are, in fact, appealing.
4             And if you decide to appeal, you must do so within
5    14 days, in writing, filed with the Court, and Mr. Lehmann
6    will assist you in that if you ask him to.
7             Do you have any questions, sir?
8             THE DEFENDANT:  No, sir.
9             THE COURT:  I would like to visit with you briefly
10   at the bench.
11            (Off-the-record bench conference)
12            THE COURT:  Okay.  We'll be in recess until 3:00.
13            Is that right?
14            COURTROOM DEPUTY:  Yes.
15            COURT SECURITY OFFICER:  All rise.
16            (End of proceedings)
17
18
19
20
21
22
23
24
25

# EXHIBIT B

## Michelle Moon

| | |
|---|---|
| **From:** | Joe Hunnicutt |
| **Sent:** | Wednesday, September 23, 2020 3:25 PM |
| **To:** | Michelle Moon |
| **Cc:** | Teresa Perez; Brad Holmes |
| **Subject:** | Jeffrey Watts |
| **Attachments:** | Jeffrey Watts.pdf |

Hello again,

Here is the letter from David Smith, owner of Chop Chop, indicating he would not be allowed back for employment.

Thank you,

Joe Hunnicutt
U.S. Probation and Pretrial Services
501 W. 10th St., Room 406
Fort Worth, Texas 76102
(817) 900-1871-office
(214) 406-2238-cell
(817) 978-3726-fax


Achiever-Communication-Includer-Learner-Restorative



Teresa Perez
205 SE 5th Ave
Amarillo TX 79101

Teresa,

It was a bit surprising but nice to hear from you today. After our visit, I went back and wanted to see when my last contact with Mr. Watts occurred. I appears that contact was an email from him in October of 2018. As I mentioned to you on the phone, Jeff and I parted on poor terms such that he would not be welcome at my company. There is no position waiting for him here. Please let me know if I can be of any further assistance.

Sincerely,

David Smith
dsmith@chopchoprice.com
806-341-7870